I AW LIBRARY

NO. 28353

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ALBERT PLEUS; PAMELA PLEUS; JAMES GROWNEY; and PRISCILLA GROWNEY,
Appellants-Appellants,
v.
ZONING BOARD OF APPEALS FOR THE CITY AND COUNTY OF HONOLULU;
DAVID TANOUE,[1] in his official capacity as Director of the
Department of Planning and Permitting for the City and County of
Honolulu; AND THRU, INC. HAWAII, a Hawaii corporation, Appellees-
Appellees.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 06-1-0447)

MEMORANDUM OPINION
(By: Nakamura, C.J., Foley, Leonard, JJ.)

Appellants-Appellants Albert Pleus, Pamela Pleus, James
Growney, and Priscilla Growney (collectively, Appellants) are
residents of Makiki Heights. They along with a significant
number of other Makiki Heights residents opposed the granting of
an application by one of their neighbors for a conditional use
permit (CUP) to operate a group living facility. The proposed
group living facility was described as an adult residential care
home for more affluent seniors who are at least sixty years old.
Appellee-Appellee Director of the Department of Planning and
Permitting (Director) for the City and County of Honolulu
approved the application of Appellee-Appellee Thru, Inc. Hawaii
(THRU or the Applicant) for the CUP.[2] The Appellants appealed
the Director's decision to approve the CUP to Appellee-Appellee
Zoning Board of Appeals (ZBA) for the City and County of
Honolulu. The ZBA affirmed the Director's decision. The

---

[1] Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)
(2000), David Tanoue, the current Director of the Department of Planning and
Permitting for the City and County of Honolulu, has been substituted as a
party to this appeal in place of Henry Eng, the Director of that department at
the time this case was decided by the Circuit Court of the First Circuit.

[2] Henry Eng was the Director who approved the CUP.

Appellants then appealed the ZBA's decision to the Circuit Court of the First Circuit (circuit court). The circuit court, the Honorable Eden Elizabeth Hifo presiding, affirmed the ZBA's decision.

Appellants appeal to this court from the circuit court's Judgment in favor of Appellees-Appellees the ZBA, the Director, and THRU (collectively, Appellees). The Judgment was based on the circuit court's decision and order affirming the findings of fact, conclusions of law, and decision and order of the ZBA (Order Affirming the ZBA). Appellants also appeal from the circuit court's order denying their motion to 1) amend the Order Affirming the ZBA and 2) amend the Judgment.

On appeal, Appellants assert that the circuit court erred in affirming the ZBA's decision to affirm the Director's decision[3] to issue the CUP. Appellants argue that the Director erred by 1) ignoring public opposition to THRU's application for the CUP; and 2) determining that THRU satisfied the four criteria required for issuance of a CUP under the City and County of Honolulu Land Use Ordinance (LUO), codified in the Revised Ordinances of Honolulu (ROH) Chapter 21.[4]

---

[3] In their briefs, Appellants refer to the Department of Planning and Permitting (DPP) as having granted the CUP, and they challenge the actions of the DPP. However, the named party in this litigation is not the DPP, but the Director of DPP in his official capacity. We will thus refer to the Director as the party responsible for the actions challenged in this appeal.

[4] Under the LUO, an applicant for a CUP must satisfy the requirements set forth in the ROH § 21-2.90-2 (1990 & Supp. No. 4, 2-04), which provides in pertinent part as follows:

    (a)    The director may allow a conditional use permit on a finding that the proposed use satisfies the following criteria:

        (1)    The proposed use is permitted as a conditional use in the underlying zoning district and conforms to the requirements of this chapter.

        (2)    The site is suitable for the proposed use considering size, shape, location, topography, infrastructure and natural features.

        (3)    The proposed use will not alter the character of the surrounding area in a manner substantially limiting,

(continued...)

2

We disagree with Appellants' contention that the Director ignored public opposition to the CUP. The Director responded to many of the concerns raised by Appellants and their neighbors by requiring THRU to satisfy numerous conditions as part of the Director's approval of the CUP. We further conclude that there was substantial evidence in the record to support the Director's determination that THRU satisfied the four criteria required for issuance of a CUP and that the Director acted within his discretion in approving the CUP.

### BACKGROUND

The following background facts are taken from the findings of fact issued by the ZBA, which were in material respects approved by the parties:

FINDINGS OF FACT

1. Petitioners [5/] are neighbors of the subject property located at 2615 Tantalus Drive, Makiki Heights, Honolulu, Hawaii.

2. Applicant with the approval of the landowner Dialta Alliata di Montereale, submitted an application for a Conditional Use Permit-Major Group Living Facility.

3. The application proposes to renovate the existing 2-story, 9,150 square feet single family residence to establish a group living facility or adult residential care home to allow a maximum of 20 residents who require minimum medical need to reside on the property.

4. The subject property is approximately 73,000 square feet. The property is classified as being within an Urban District under State land use law and is currently zoned R-10 Residential under the [LUO].

5. The surrounding neighborhood is residential. The subject property borders Tantalus Drive to the north and Makiki Heights Drive to the south.

---

4/ (...continued)
impairing or precluding the use of surrounding properties for the principal uses permitted in the underlying zoning district.

(4) The use at its proposed location will provide a service or facility which will contribute to the general welfare of the community-at-large or surrounding neighborhood.

5/ The Petitioners in the proceeding before the ZBA were the Appellants and Sigrid Grover, Kathryn Howard, and Michael E. and Patricia J. O'Neill.

6. The Department of Planning and Permitting held a public hearing on the application on April 22, 2005.

7. The Director received numerous written and oral comments to the application from neighbors and witnesses. Approximately 200 individuals submitted written testimony in opposition to the Application for Issuance of a Conditional Use Permit (Major) for a Group Living Facility. Fifteen neighbors presented live, oral testimony at the public hearing either opposing or raising concerns regarding issuance of the [CUP]. The comments against the application were on various grounds objecting to the findings under the [ROH] Section 21-2.90-2 that the Director was required to make before granting the CUP, and addressing whether granting a CUP for the proposed use complied with the Primary Urban Center Development (PUC) Plan.

8. The concerns raised by the neighbors opposed to the granting of the CUP include but are not limited to the following: that the proposed use is not suitable for the quiet single family neighborhood and that the existing infrastructure in the neighborhood could not support the proposed use; that the proposed group living facility is too large (including the number of patients, staff, and visitors) for the area and that the facility would have a significant negative impact on the neighborhood; that the proposed use will increase the traffic on the neighborhood roadways that are narrow and inadequate to accommodate the increase in use; that the proposed use will cause an increase in on-street parking because the number of on-site parking spaces for the proposed use is inadequate; that the Applicant provided insufficient information on the proposed facility's operation to allow the Director to assess the land use impact of the facility's operation; and that the facility would not benefit the community as the target market consists of affluent seniors able to pay $90,000.00 to $120,000.00 a year to reside in an adult residential care home offering minimal medical care.

9. The comments in favor of the application included that the site is relatively isolated from the neighbors and the proposed use is relatively innocuous and will preserve the large estate. Aside from the Applicant, there was only one neighbor that testified in favor of granting the CUP.

10. As is standard procedure, the Director sought comments from various governmental entities that may be affected by the proposed use. The Director received comments from the following governmental entities; Board of Water Supply, Honolulu Fire Department, Honolulu Fire Department [sic], and various Divisions of the Department of Planning and Permitting including the Traffic Review Branch, Refuse Collection Branch, and the Drainage and Flood Branch.

11. The Traffic Review Branch, of the Department of Planning and Permitting, commented that the driveways for the proposed group living facility should be wide enough to accommodate two-way traffic. The Traffic Review Branch did not recommend that a traffic assessment be performed prior to approval of the CUP-Major for the group living facility. The Traffic Review Branch, however, proposed a traffic assessment be conducted within six months of the issuance of

the certificate of occupancy by the Applicant, and thereafter on an annual basis.

12. The traffic assessment suggested by the Traffic Review Branch included documenting actual number of vehicles entering and exiting the facility, the purpose of each trip, and the annual update should include methods of reducing the total number of trips, and should include incentives to reduce the number of trips including bus and other transit incentives to employees, carpooling by visitors and employees and scheduling of trips to avoid peak hours of traffic.

13. As part of its application for the CUP, the Applicant stated that the residents of the proposed group living facility would not be permitted to have cars, and that most of the traffic from the facility should not occur during peak traffic hours. The Applicant also stated that the facility's employees would be encouraged to use the bus, and estimated that the facility would generate an average of 20 to 25 trips per day.

14. On May 31, 2005, the Director approved the Applicant's CUP-Major for a group living facility and imposed eighteen conditions on the approval including, but not limited to, that the total number of adult residential care recipients shall be limited to a maximum of 16, the entire facility shall be administered by one care provider, the Applicant shall submit a valid Department of Health license for the facility, drive ways shall accommodate two way traffic, including the survey suggested by the Traffic Review Branch, deliveries shall be restricted to 9:00 a.m. to 4:00 p.m. Mondays to Saturdays, and that quiet hours shall be between 10:00 a.m. to 6:00 p.m.

15. The Director determined that under LUO Table 21-3 Master Use Table [(ROH Table 21-3)] a group living facility was permitted within the R-10 Residential zoned areas with a conditional use permit. The Director also determined that, except for yard and height requirements, the proposed group living facility would comply with the development standards of the LUO for R-10 Residential Districts.

16. The Director further determined that the 73,000 square feet site, that the topography and natural features of the site, where the group living facility would be located would be able to accommodate a maximum of 16 residents because two single family dwellings could be constructed on the lot without subdividing the property. With respect to the ability of the neighborhood's infrastructure to accommodate the proposed use, the Director determined that the current infrastructure could accommodate the proposed use because he received no major objection to the proposed use by any governmental agency.

17. The Director also determined that although the Applicant provided few specific details about the operation of the proposed use, the proposed use is a group living facility as designated in the LUO, and thus is residential in nature and would not alter the principle [sic] nature of the residential use of the surrounding properties. The Director deferred to the Department of Health regarding the

operation and the specific licensing requirements for a group living facility.

18. The Director determined that the Applicant's proposed group living facility would provide a service and contribute to the general welfare of the community at large by providing expanded housing opportunities for the growing elderly population in Hawaii, and by providing housing options for seniors.

In its Order Affirming the ZBA, the circuit court added two conditions to those imposed by the Director in his approval of the CUP. The two additional conditions imposed the circuit court were that 1) residents of the group living facility would not be allowed to have cars; and 2) all parking for the group living facility would be on the site and not on the street.

STANDARDS OF REVIEW

"The ZBA is the administrative agency designated to hear and determine appeals from the [D]irector's actions in the administration of the City and County of Honolulu zoning code." Save Diamond Head Waters LLC. v. Hans Hedemann Surf, Inc. 121 Hawaiʻi 16, 24, 211 P.3d 74, 82 (2009) (block quote format and citations omitted). An order by the ZBA is an administrative decision subject to review by the circuit court. Id.; Hawaii Revised Statutes (HRS) § 91-14(a) (1993).

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decision.
>
> Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawaiʻi 184, 193, 159 P.3d 143, 153 (2007) (citing Korean Buddhist Dae Won Sa Temple of Hawaiʻi v. Sullivan, 87 Hawaiʻi 217, 229, 953 P.2d 1315, 1327 (1998)). HRS § 91-14(g), "Judicial review of contested cases," provides:
>
> > (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> >
> > > (1) In violation of constitutional or statutory provisions; or

6

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g) (1993). "'Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6).'" Paul v. Dep't of Transp., 115 Hawai'i 416, 426, 168 P.3d 546, 556 (2007) (internal brackets omitted) (quoting Konno v. County of Hawai'i, 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997)). "A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Del Monte Fresh Produce (Hawaii), Inc. v. International Longshore and Warehouse Union, Local 142, AFL-CIO, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (internal brackets and quotation marks omitted) (quoting Price v. Zoning Bd. of Appeals of City and County of Honolulu, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994)).

Save Diamond Head Waters, 121 Hawai'i at 24-25, 211 P.3d at 82-83 (brackets omitted).

An "agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences." Korean Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (block quote format and citations omitted).

DISCUSSION

Appellants argue that the Director "acted contrary to the regulatory scheme of the LUO" by ignoring the public opposition to THRU's application for the CUP (Major) and the lack of substantial evidence that THRU had satisfied the four criteria required for the issuance of the CUP. Appellants argue that the Director treated the issuance of the CUP as automatic and rubber-

stamped THRU's application.  We disagree with Appellants' arguments.

I.

Contrary to Appellants' contention, the record shows that the Director considered the public opposition to THRU's application for the CUP, including the testimony of neighbors to the subject property that was presented at the public hearing on THRU's application.[6/]  The Director responded to many of the concerns raised by the neighbors by imposing numerous conditions on his approval of the CUP.

The most significant concerns expressed by those opposed to THRU's application was the size of the proposed adult residential care home (in terms of the number of people) and the impact that it would have on traffic.  The Director responded to these concerns by reducing the number of adult care recipients who could reside at the care home from a maximum of twenty (as sought by THRU in its application) to a maximum of sixteen.  The reduction in the permissible number of adult care residents correspondingly reduced the traffic and other land use impacts of the proposed facility.

In addition, the Director imposed several conditions on the approval of the CUP that were directed at mitigating the traffic impacts of the proposed project.  These included:

1.    A requirement that THRU submit a revised site plan showing the location of a loading space with

---

[6/] After the public hearing, the Director requested additional information from THRU on thirteen separate matters in order to assist the Director in addressing "community concerns and to evaluate the potential impacts of the proposed project."  These requests included asking THRU to identify the location of the on-site loading area for service vehicles and explain how employees will access the facility from the parking area near the tennis court, discuss what kind of emergency plans will be implemented and what level of care the staff will be qualified to administer, describe measures to mitigate noise, clarify traffic impacts, and provide all building permits.  THRU responded by providing additional information, including on-site pictures and a scaled drawing.  In response to statements made at the public hearing, THRU also represented to the Director that the residents of the facility would not be permitted to have cars, that most of the traffic generated by the facility would not occur during peak traffic hours, and that the facility's employees would be encouraged to use the bus.

adequate access and maneuvering area that would not obstruct any parking space or access aisle.

2. A requirement that driveways be wide enough to accommodate two-way traffic and that landscaping and structures in the vicinity of the driveways be maintained to provide adequate sight distances to pedestrians and other vehicles.

3. A requirement that within six months of the issuance of a certificate of occupancy for the group living facility and on an annual basis thereafter, THRU prepare and submit a traffic assessment regarding the impact of the facility to the Department of Planning and Permitting (DPP) for its review and approval. The assessment should provide information about the number and types of vehicles entering and leaving the site and the purpose of the trips; address the methods and strategies used by THRU, and the success of each strategy, to reduce the total number of vehicle trips to the site and the overall traffic demand; and document traffic related complaints by surrounding residents and steps to address such complaints.

4. A restriction on deliveries by service vehicles to between 9:00 a.m. and 4:00 p.m., Mondays through Saturdays.

The Director's actions in reducing the number of adult care recipients who could reside at the proposed care home and imposing numerous conditions on his approval of THRU's application belie Appellants' claim that the Director ignored public opposition to THRU's application and rubber-stamped the proposed project. The record clearly shows that the Director considered the concerns of those opposing the project in the decision-making process.

II.

Appellants argue that the Director erred in determining that THRU satisfied each of the four criteria required for a CUP because there was no substantial evidence or basis in the record to support the Director's determinations.  The four criteria that must be satisfied for an applicant to be eligible for a CUP are:

(1)   The proposed use is permitted as a conditional use in the underlying zoning district and conforms to the requirements of this chapter.

(2)   The site is suitable for the proposed use considering size, shape, location, topography, infrastructure and natural features.

(3)   The proposed use will not alter the character of the surrounding area in a manner substantially limiting, impairing or precluding the use of surrounding properties for the principal uses permitted in the underlying zoning district.

(4)   The use at its proposed location will provide a service or facility which will contribute to the general welfare of the community-at-large or surrounding neighborhood.

ROH § 21-2.90-2.  We conclude that the Director did not err in finding that each of these four criteria had been satisfied.

A.

Appellants assert that the Director erred in finding that the proposed project satisfied the first criteria:  "The proposed use is permitted as a conditional use in the underlying zoning district and conforms to the requirements of [the LUO]."  Appellants do not challenge the Director's determination that group living facilities, which include adult residential care homes, are permitted as a conditional use within the R-10 zoned Residential District in which the subject property is located.  See ROH Table 21-3 Master Use Table (1990 & Supp. No. 11, 8-07).  However, Appellants contend that the Director erred in finding that the first criteria had been satisfied because 1) the dwelling on the subject property did not meet the current LUO requirements for building height or yard setback; and 2) there was insufficient evidence to support the Director's conclusion

10

that twelve on-site parking stalls would provide adequate parking for the proposed adult residential care home. We disagree.

The Director found that the 9,150-square-foot dwelling was constructed pursuant to building permits, indicating that it complied with the applicable development standards when built. The Director further found that structures on the property, including the dwelling, "met residential setbacks when they were constructed." Appellants do not dispute that the dwelling met applicable development standards at the time it was built, but argue that because the first criteria requires conformance with the requirements of the LUO, the dwelling must comply with the LUO's current height and setback requirements.

The LUO, however, permits a nonconforming structure[2] that "was legally established as it now exists" to be continued, subject to certain exceptions not applicable to this case. ROH § 21-4.110 (1990 & Supp. No. 4, 2-04 & Supp. No. 9, 8-06). Indeed, the LUO specifically provides that "[a]ny nonconforming structure may be repaired, expanded or altered in any manner which does not increase its nonconformity." ROH § 21-4.110(b)(3). Thus, the Director's decision to permit the dwelling's nonconformity regarding building height and setbacks to continue was in compliance with the requirements of the LUO.

The same is true of the Director's decision to require twelve on-site parking stalls. The record indicates that the Director's decision regarding the number of parking stalls was based on the number of bedrooms and office square footage in the dwelling. Moreover, the circuit court imposed an additional condition with respect to the CUP, which has not been challenged by THRU on appeal, that residents of the group living facility will not be allowed to have cars, thereby ensuring that the

---

[2] The LUO defines "nonconforming structure" in relevant part as "a structure which was previously lawful but which does not comply with the sign, density, yard, setback or height regulations of the district, or design requirements of the special district in which it is located . . . ." ROH § 21-10.1 (1990 & Supp. No. 9, 8-06).

parking spaces would be fully available for use by non-residents. While Appellants contend that it is "unlikely" that twelve on-site stalls will be sufficient, they do not cite to any provision of the LUO that was violated by the Director's decision or which would require more parking spaces.

B.

Appellants argue that the Director erred in finding that the proposed project satisfied the second criteria: "The site is suitable for the proposed use considering size, shape, location, topography, infrastructure and natural features." Appellants contend that the Director erred in finding that the second criteria was satisfied because 1) the Director's comparison of the sixteen-resident group living facility (that he approved) to two eight-resident adult residential care homes was unreasonable; and 2) the Director failed to present the public comments raising concerns about traffic to the Traffic Review Branch of DPP, which did not object to the proposed project or recommend a prior traffic study. We conclude that Appellants's arguments lack merit.

1.

In support of his determination that the site was suitable for the proposed use, the Director found that the 73,000-square-foot site exceeded the 10,000 square foot minimum lot area required for the R-10 Residential District in which the site was located. In response to concerns expressed by neighboring residents that the proposed twenty-resident facility was too large and would intensify the land use, the Director responded that

> under current zoning regulations, without subdividing the property, two single-family dwellings can be constructed on the 73,000-square foot lot. Each dwelling could accommodate a family. The definition of a family includes eight or fewer persons who reside in an adult residential care home, monitored and/or licensed by the State of Hawaii. Resident managers or supervisors are not included in the resident count; non-resident supervisors are also permitted. A [CUP] is not required under these circumstances. Therefore, if the amount of residents were reduced to 16, the proposal would not increase density in terms of the number of residents permitted "by-right" on the site. As such, a

12

limitation on the number of adult residential care home residents to a maximum of 16 will be made a condition of approval.

Appellants contend that the Director erred in considering the land use impact of two eight-resident adult care homes on the subject property in evaluating the suitability of the site for the proposed project. We disagree. Appellants claim that two eight-resident adult care homes could not be placed on the subject property because the LUO requires adult care homes to be separated by 1,000 feet. That claim is wrong. The LUO provides that "[a]ny zoning lot which has a least twice the required minimum lot size for the underlying . . . residential district may have two detached dwellings." ROH § 21-8.30(a) (1990 & Supp. No. 9, 8-06). At 73,000 square feet, the subject property greatly exceeds the 10,000 square foot minimum lot size for a R-10 Residential District. Under the LUO, two detached dwelling could be built on the subject property and each dwelling could be used to operate an adult residential care home with eight residents plus a resident manager or supervisors, all without the need for a CUP. This is because the LUO defines a "family" of people occupying a dwelling unit to include "eight or fewer persons who reside in an adult residential care home," excluding a resident manager or supervisors. ROH § 21-10.1 (1990 & Supp. No. 2, 2-03).

The permissible alternative uses of the subject property without the need for a CUP was a relevant factor for the Director to consider. An examination of the land use impacts of other authorized ways in which the landowner could use the subject property without a CUP provided a permissible means of measuring or assessing the suitability of the site for the proposed use. We cannot say that the Director acted improperly or unreasonably in considering the potential impact of two eight-resident adult care homes on the subject property in support of his determination that the site was suitable for a sixteen-resident group living facility.

13

2.

Prior to approving the CUP, the Director consulted with the Honolulu Police Department (HPD) and the Traffic Review Branch of DPP regarding the traffic impacts of the proposed project. Neither HPD nor the Traffic Review Branch objected to the application for the CUP. HPD responded that "[a]lthough there may be a slight increase in vehicular traffic, this project should have no significant impact on the facilities or services of the [HPD]." The Traffic Review Branch responded with the following comments:

> 1. All driveways shall be wide enough to accommodate two-way traffic. Landscaping and structures in the vicinity of the project driveways shall be maintained such that adequate vehicular sight distance to pedestrian and other vehicles is provided.

> 2. Within 6 months of the issuance of the certificate of occupancy for the group living facility, and on an annual basis, an assessment documenting traffic related conditions from the general activities of the group living facility shall be submitted to the DPP for review and approval. The assessment should identify the number and types of vehicles entering and exiting the site and the intended purpose of the trip, including employees, visitors, emergency medical service vehicles, and other trip ends, as appropriate. The annual update should address methods utilized by the facility to reduce the total number of vehicle trips to the site and any traffic demand management (TDM) strategies that have been employed to reduce the overall traffic demand and the relative success rate of each strategy, which would include bus and transit incentives, car pooling by employees and visitors, scheduling trips to and from the site to not coincide with the normal peak periods of traffic and other TDM measures, as specified. The assessment should also document traffic related complaints or comments provided by the surrounding residents and the relative course of action taken to address the complaints or comments. The annual update shall be submitted for review and approval by DPP until such time that the TRB [(Traffic Review Branch)] deems that it is no longer necessary.

The Director incorporated, virtually verbatim, the comments of the Traffic Review Branch as conditions to his approval of THRU's application for the CUP.

Appellants argue that Director erred in determining that the site was suitable for the proposed project without adequately assessing the traffic impacts in light of the "narrow roads and dangerous curves in Makiki Heights." In particular,

Appellants contend that the Traffic Review Branch's evaluation of the traffic impacts of the proposed project was flawed because the Traffic Review Branch did not review the public comments raising concerns about traffic. Appellants also contend that a traffic study should have been required before the CUP was approved rather than the post-approval study recommended by the Traffic Review Branch.

Contrary to Appellants' contention, the record indicates that the Traffic Review Branch did review the public comments regarding traffic concerns as part of its evaluation. At the ZBA hearing, DPP Staff Planner Lynne Kauer (Kauer), who reviewed THRU's application for the CUP and was involved in drafting the Director's decision approving the CUP, testified as follows:

Q. [By Appellants' counsel] What if any weight did you give to the testimony and the letters from over 200 of the neighbors that were concerned about the traffic problems that would be created by this facility?

A. We reviewed all of the comments and we consulted with the traffic review branch. We have to rely on the appropriate agencies to provide us the necessary information on traffic. And the traffic review branch did not have any objections to this proposal. They did not think that there was a problem.

Q. What was presented by you to the traffic branch?

A. The entire application is sent to the traffic review branch for their review.

. . . .

Q. And did you have any discussions with the people in the traffic review branch about why the [D]irector shouldn't be concerned about the comments by over 200 of the neighbors about the traffic problems that were already existing up in this neighborhood before you're going to add a commercial facility that increases the traffic?

A. The traffic review branch was presented with all the information and they did not feel that the roads couldn't accommodate it or that there was any kind of need for a traffic study or they did not have any objections to the proposal.

. . . .

Q. Did you have any discussions with anybody about the concerns that the neighbors had whether these were real concerns or just their wild imagination that you have 200

15

neighbors coming in and saying the traffic's already
terrible on their roads, don't make it worse.  Did you have
any discussions with anybody concerning that concern of the
neighbors?

A.    Yes, we have to take into all the -- we have to take
all those considerations into -- those concerns into
consideration.

Q.    And --

A.    We had discussions with the traffic people.  We had
discussions with the [D]irector.

Q.    And the conclusion was that those aren't legitimate
concerns; is that correct?

A.    I don't think we said that they were not legitimate
concerns, but we did address those concerns in the report.

Q.    And you addressed them how?

A.    By consulting the traffic review branch for their
input on the application and the proposal.  They did not
feel that this would significantly impact traffic, the scale
of this facility from what would ordinarily be allowed in
the district.

Q.    Anybody in that branch live up there or have any
direct knowledge of the traffic problems involved?

A.    I'm sure they do.  They are aware of traffic problems
on the island.  I mean that's what they do.  That's their
role.  I mean that's what they do.

(Emphasis added.)

        In addition to Kauer's testimony, the Traffic Review
Branch's comments to the proposed project provide compelling
evidence that it was presented with and reviewed the public
comments about traffic concerns.  The Traffic Review Branch's
comments, which were incorporated as conditions to the Director's
approval of the CUP, address many of the traffic concerns
expressed by the public.  For example, the Traffic Review
Branch's recommendation that all driveways be wide enough to
accommodate two-way traffic and be maintained to provide for
adequate vehicular sight distance responds to public concerns
that parking spaces on the subject property will be difficult to
enter and exit and exiting vehicles will be difficult for

oncoming cars to see.[8] Furthermore, many of the provisions of the traffic assessment that the Traffic Review Branch recommended be done after approval of the CUP reflect concerns raised by the public, including the provisions regarding the identification of the number and types of vehicles traveling, and the intended purpose of trips, to and from the subject property; methods used to reduce the number of vehicle trips to the subject property; strategies used to reduce overall traffic demands such as scheduling trips to not coincide with the normal peak periods of traffic; and documentation of traffic related complaints by the surrounding residents and the actions taken to address the complaints.

Under these circumstances, we conclude that it was appropriate for the Director to rely upon the evaluation of the Traffic Review Branch in determining the suitability of the site for the proposed use. The Traffic Review Branch did not recommend that a traffic assessment needed to be conducted prior to approval of the CUP and instead recommended a post-approval traffic assessment to monitor and address the traffic impacts. Based on the record in this case, we cannot say that the Director erred in finding that the site was suitable for the proposed use without requiring a pre-approval traffic study.

C.

Appellants argue that the Director erred in finding that the proposed project satisfied the third criteria: "The proposed use will not alter the character of the surrounding area in a manner substantially limiting, impairing or precluding the use of surrounding properties for the principal uses permitted in the underlying zoning district." Appellants contend that THRU lacked experience in operating an adult residential care home and therefore there is no support in the record for the staffing and

---

[8] In his decision approving the CUP, the Director noted that the concerns raised in opposition to the CUP included that "[t]he two parking spaces with access from Makiki Heights Drive will be difficult to enter and exit and the entry will be difficult for oncoming cars to see."

17

operational estimates THRU included in its application.
Appellants further contend that because the Director improperly
relied upon THRU's unsupported estimates to evaluate the traffic
impact of the proposed project on the surrounding community, the
Director's determination that the proposed project would not
alter the character of the neighborhood was erroneous. We
disagree with Appellants' arguments.

Although THRU had no prior experience operating an
adult residential care home, the record shows that THRU hired a
consultant who did have experience with the operation of an adult
residential care home. The staffing and operational estimates
included in THRU's application were based on information and
input provided by THRU's consultant. We conclude that the
Director's reliance on THRU's estimates was not improper and that
the Director did not err in finding that the proposed project
would not alter the character of the neighborhood in a manner
substantially limiting, impairing or precluding the principal
uses of the surrounding properties.

THRU hired Donald Clegg (Clegg), who was the former
director of the Department of Land Utilization, the predecessor
department to the DPP, to prepare the application for the CUP.
Clegg testified at the ZBA hearing that he had assisted other
clients in obtaining licences and permits for the operation of
care homes, including one or two clients who needed CPUs. In
this capacity, he "consult[ed] with the operators of these
facilities and gather[ed] the basic data about what was involved
in the operations."

More importantly, Clegg testified that THRU had
retained Sarah Suzuki (Suzuki) of Blue Water Resources, a
consultant in elderly care homes who had experience in, and was
currently operating, an elderly care home. Clegg stated that
Suzuki provided assistance with respect to staffing and general
operations. Clegg testified that THRU's estimate of twenty to
twenty-five round trips per day for the proposed adult
residential care home was based on information from "the

consultants . . . who have operated and planned similar facilities" and that THRU increased the staffing levels based on input from the consultants.  Clegg further testified that Suzuki was present at the open house THRU held for neighboring residents; that Suzuki answered questions at the open house and talked about the number of people who would be involved in the operation of the care home, including who would be working and what they would be doing; that the substance of THRU's application included Suzuki's input; and that Suzuki "basically approved" the staffing estimates proposed by THRU.

In addition, DPP Staff Planner Kauer testified that with respect to THRU's staffing estimates, THRU would have to meet certain staffing requirements of the State Department of Health (DOH) for adult care facilities.  Kauer stated that she reviewed the DOH guidelines establishing the minimum number of employees an operator would require.  In terms of the staffing figures provided by THRU, Kauer stated that as far as she knew, THRU was complying with the DOH guidelines.

We also note that THRU's application for the CUP was based on the staffing requirements for a proposed twenty-resident adult care facility.  The Director's reduction of the number of residents for the proposed care home to a maximum of sixteen adult care residents provides a margin of safety to protect against THRU's underestimation of its staffing requirements.

We conclude that there is sufficient evidence in the record to support the Director's reliance on THRU's staffing and operational estimates.  Accordingly, the Director had an adequate basis on which to assess the traffic impacts of the proposed project.

We disagree with Appellant's claim that the Director abused his discretion by ceding his obligation to assess the land use impacts of the proposed adult care home to the DOH.  The Director noted that THRU would have to provide detailed information about its operations to obtain a license from DOH to operate an adult residential care home.  In order to ensure that

19

the operation of the facility was consistent with THRU's application for the CUP, the Director required THRU to submit a copy of the DOH license prior to occupying the facility and to maintain a valid DOH license at all times.

The Director did not cede his obligation to assess the land use impacts of the proposed project to the DOH. Instead, requiring THRU to obtain and maintain a DOH license was a means for the Director to obtain additional assurance that the proposed project would in fact be operated as adult residential care home in a manner consistent with the representations contained in THRU's CUP application. In this respect, THRU's obligation to obtain and maintain a DOH license was relevant to the Director's finding that the proposed use would not alter the character of the surrounding area.

Appellants express their skepticism over whether THRU will comply with the conditions imposed on the approval of its application for the CUP or with the representations it made in its application. However, in approving the CUP, the Director retained the authority to revoke the CUP for noncompliance with the conditions imposed. The Director also reserved the right to change the conditions for the CUP "upon a finding that circumstances related to the approved project have significantly changed so as to warrant a modification to the conditions of approval." We conclude that the Director did not err in finding that the third criteria had been satisfied.

D.

Appellants assert that the Director erred in finding that the proposed project satisfied the fourth criteria: "The use at its proposed location will provide a service or facility which will contribute to the general welfare of the community-at-large or surrounding neighborhood." We disagree with Appellants' claim of error.

20

In determining that the fourth criteria had been satisfied, the Director found in pertinent part:

> The proposed group living facility will provide a service that will contribute to the general welfare of the community-at-large. The facility will provide expanded housing opportunities for the growing elderly population by providing housing options for senior citizens. The facility will provide elderly housing choices for in-town (urban) living, offering the convenience and amenities of an urban lifestyle. These include seniors no longer able to live on their own, but wanting to remain near their home neighborhoods.

The record contains a report by the State of Hawai'i's Executive Office on Aging and a newspaper article that reference the challenges presented by Hawai'i's older adult population. These materials show that life expectancy has increased and that Hawai'i's older adult population is already large and is growing much faster than the older adult population nationally. As noted by the Director, the proposed group living facility will provide increased housing opportunities and options for seniors, especially for those who may be unable to live on their own but wish to remain near to their families, by offering the convenience and amenities of an in-town residence. We conclude that the Director did not err in finding that the use of the subject property to provide such increased housing options and opportunities would contribute to the general welfare of the community-at-large.[9]

E.

We conclude that there was sufficient evidence in the record to support the Director's determination that THRU satisfied the four criteria required for issuance of a CUP. Based on our review of the record, we conclude that the Director acted within his discretion in approving the CUP.

[9] In its reply brief, Appellants raise a new argument that the circuit court erred by failing to include two additional conditions (besides the conditions it imposed) in its written Order Affirming the ZBA that the circuit court had orally indicated it would include. Appellants, however, are not entitled to raise an argument for the first time in its reply brief, and we decline to address this argument. See In re Hawaiian Flower Mills, Inc., 76 Hawai'i 1, 14 n.5, 868 P.d 419, 432 n.5 (1994); HRAP Rule 28(b)(7) and 28(d) (2006).

CONCLUSION

We affirm the circuit court's October 11, 2006, Judgment in favor of Appellees and its October 10, 2006, Order Affirming the ZBA.  We also affirm the circuit court's December 8, 2006, order denying Appellants' motion to 1) amend the Order Affirming the ZBA and 2) amend the Judgment.

DATED:  Honolulu, Hawaiʻi, May 28, 2010.

On the briefs:

J. Stephen Street,
Reginauld T. Harris
(Rush Moore LLP)
for Appellants-Appellants

Duane W.H. Pang,
Deputy Corporation Counsel,
City and County of Honolulu
for Appellee-Appellee
DAVID TANOUE, in his official
capacity as Director of the
Department of Planning and
Permitting for the City and
County of Honolulu

Robert F. Miller
for Appellee-Appellee
Thru, Inc., a Hawaii Corporation

Chief Judge

Associate Judge

Associate Judge